UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOHNNY YOUNT, JR. on behalf of ) | |
| STEVEN R. YOUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 3:14-cv-01000 |
| v. ) | Senior Judge Nixon |
| ) | Magistrate Judge Brown |
| ) | |
| CAROLYN W. COLVIN, ) | |
| ACTING COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff Steven Yount filed for DIB and SSI on May 5, 2010 alleging a disability onset date of August 30, 2009, amended later to September 2, 2010. (Doc. 10, pp. 54, 128, 135, 152, 194, 216)[1] Plaintiff claimed he was unable to work because of HIV, depression, anxiety, shoulder muscle, back

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the numbers that appear in **bold** in the lower right corner of each page.

and arthritis pain. (Doc. 10, pp. 76-77, 82, 85, 156) Plaintiff's application was denied initially on December 8, 2010, and upon reconsideration on April 20, 2011. (Doc. 10, pp. 67-71,)

Plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 10, pp. 86-87) A hearing was held on October 17, 2012 in Nashville before ALJ Shannon Smith. (Doc. 10, pp. 27-66) Vocational expert (VE) Chelsea Brown testified at the hearing. (Doc. 10, pp. 27, 45-47, 61-64) Plaintiff was represented by counsel at the hearing. (Doc. 10, p. 27)

The ALJ entered an unfavorable decision on November 16, 2012. (Doc. 10, pp. 6-21) A request was filed with the Appeals Council on January 11, 2013 to review the ALJ's decision. (Doc. 10, pp. 216-18) The Appeals Council denied plaintiff's request on February 11, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-5)

Plaintiff brought this action through counsel on April 16, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on August 14, 2014. (Doc. 12) In September 2014, two motions were filed to substitute Johnny Yount, Jr. for his son, Steven, who died on February 1, 2014. (Docs. 13, 15) The motion to substitute was granted on September 15, 2014. (Doc. 17) Thereafter, the Commissioner responded to the motion for judgment on the administrative record on November 17, 2014 (Doc. 21), and plaintiff replied on December 1, 2014 (Doc. 22). This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence[2]

Plaintiff was treated by Dr. Lisa Laya, M.D., from January 2007 to September 2012. (Doc. 10, pp. 245-287, 388-428) On August 10, 2010, Dr. Laya made the following note in the treatment

---

[2] Review of the medical record has been tailored to plaintiff's claims of error. Those portions of the medical records not covered in this R&R are incorporated herein by reference.

record for that date: "refill of his Xanax since he states he could not afford to go to Dr Gaston . . . and pay[] his copay." (Doc. 10, p. 413)

Doctor Laya wrote the following letter to Judge John Glenn on November 1, 2010 at plaintiff's request:

> Please be advised that Mr. Steven Yount is under my care. He is currently under my care for treatment of HIV/AIDS, anxiety/depression, and chronic low back pain. He has multiple medical problems with a fair prognosis. He is unable to work and give child support.

(Doc. 10, pp. 389, 411) Doctor Laya wrote a second letter to Judge Glenn on May 1, 2012:

> Please be advised that Mr. Steven Yount continues to be under my care for treatment of acquired immune deficiency syndrome. He continues to suffer from depression and anxiety and has chronic pain syndrome. He is unable to maintain a job and provide child support.

(Doc. 10, p. 388)

Doctor Laya reported on August 23, 2011 that plaintiff "separated from his girlfriend." (Doc. 10, p. 407) Doctor Laya noted following an office visit on December 15, 2011 that plaintiff had "a new girlfriend who is on disability as well." (Doc. 10, p. 405) Doctor Laya noted in a June 9, 2012 clinical note that plaintiff's "girlfriend goes [t]o a pain specialist." (Doc. 10, p. 399)

Plaintiff was treated at Summit Primary Care during the period March 2008 to May 2010. (Doc. 10, pp. 288-324, 429-39) Doctor Robert Gaston, M.D., wrote the following on September 28, 2009:

> This patient . . . [s]tates that he had his medicines in glove compartment of his truck, and he states that he had it locked, and somebody broke into his truck and stole his medicine. States that he had his pain medicine as well as his nerve medicine in the truck, and it was stolen. He has a police report. He states that he went to the pain clinic . . . and they wouldn't refill his pain medicine, so he comes in to see if we would. I told him I can't refill the pain medicine since he goes to the pain clinic. . . . I told him I couldn't give him a refill

3

> on his Lortab since he had a contract with the pain clinic, so I advised him to go back to the pain clinic with his police report . . . .

(Doc. 10, p. 307) Doctor Gaston, noted the following on May 14, 2010:

> . . . . He has been going to a pain clinic but was dismissed from there because he was getting pain medicine from other doctors. I thought we had sent him a letter of dismissal several weeks ago, but apparently, it hasn't gone out. I had found out he was getting these medicines from other doctors, so he comes in for a check today. I tell him that we can't continue to prescribe pain medicine, that he'll need to get into a pain clinic for this or find another doctor who will. . . .

(Doc. 10, p. 292)

Plaintiff was treated at Tennessee Physical Medicine and Pain Management from March 2006 to February 2010. (Doc. 10, pp. 228-44, 301-02) Nurse Practitioner Curry Dudley recorded the following on February 4, 2010: "Check[ed] with state Controlled Monitoring and he is already getting Percocet from another physician and going to different pharmacies. Patient was told that we would no longer treat with any controlled substances." (Doc. 10, p. 302)

Doctor Roy Johnson, M.D., consultively examined plaintiff on August 11, 2010. (Doc. 10, pp. 326-337) Doctor Johnson completed two separate reports related to the examination, one titled *Medical Assessment of Ability to Do Work-Related Activities (Physical)* dated "8/20/10" (Doc. 10, pp. 330, 334)(the first report), and the other a more detailed *Medical Source Statement of Ability to Do Work Related Activities (Physical)* dated "8/ [sic] /10" (Doc. 10, pp. 331, 332, 333, 335-37)(the second report). In the first report, Dr. Johnson determined that plaintiff could lift/carry 10 lbs. occasionally and 10 lbs. frequently, sit a total of 6 hrs. in an 8 hr. workday, stand and/or walk up to 2 hrs. in an 8 hr. workday. (Doc. 10, pp. 330, 334) In the second report, Dr. Johnson determined that plaintiff was able to lift/carry up to 10 lbs. occasionally, up to 20 lbs., also occasionally, sit 6 hrs. without interruption, stand and walk 30 mins. each without interruption, sit 6 hrs. total in an 8-

4

hr. workday, stand and walk 1 hr. each in an 8 hr. workday. (Doc. 10, pp. 331, 335) Dr. Johnson also identified manipulative, postural, and environmental limitations in his second report, as well limitations on activities of daily living. (Doc. 10, pp. 332-33, 335)

Linda Blazina, Ph.D., conducted a psychological evaluation of plaintiff on September 8, 2010. (Doc. 10, pp. 338-41) She determined, among other things, that plaintiff had a Global Assessment of Functioning (GAF) Score of 60-65. (Doc. 10, p. 341)

Christopher Fletcher, M.D., conducted a physical residual functional capacity (RFC) assessment of plaintiff on December 7, 2010. (Doc. 10, pp. 367-75) Doctor Fletcher determined that plaintiff could perform medium work with postural and manipulative limitations. (Doc. 10, pp. 368-70) Doctor Fletcher also wrote:

> MER SHOWS CLEAR EVIDENCE OF DOCTOR SHOPPING AND VIOLATION OF PAIN MGMT AGREEMENT. ALLEGED FUNCTIONAL IMPACT OF MDIs FAR EXCEEDS WHAT IS EXPLICABLE FROM OBJECTIVE DATA.

(Doc. 10, p. 374)

Doctor Carolyn M. Parrish, M.D., conducted a physical RFC assessment on April 16, 2011. (Doc. 10, pp. 378-86) Doctor Parrish also determined that plaintiff could perform medium work with postural and manipulative limitations. Doctor Parrish wrote twice in her report:

> MER SHOWS CLEAR EVIDENCE OF DOCTOR SHOPPING AND VIOLATION OF PAIN MGMT AGREEMENT. ALLEGED FUNCTIONAL IMPACT OF MDIs FAR EXCEEDS WHAT IS EXPLICABLE FROM OBJECTIVE DATA.

(Doc. 10, pp. 383, 385)

## B. Transcript of the Hearing

The portions of the transcript of the hearing that pertain to plaintiff's claims of error are addressed below. The remainder of the transcript is incorporated herein by reference.

Plaintiff appeared at the hearing with a walker. The following related testimony was adduced upon questioning by the ALJ:

> Q . . . . I see that you have a walker with you today. Who prescribed your walker?
>
> A Nobody. I got it from a friend because I've been falling.
>
> Q How long have you been falling?
>
> A For about two or three months.
>
> Q Okay.
>
> A And the doctor I go to won't do nothing about it. She's in there for three minutes and – which my insurance is a $2,500 deductible, so I can't really, you know, go to anybody else.

(Doc. 10, p. 48)

The following further testimony about the walker was adduced upon questioning by counsel:

> Q In September 2010, were you having problems getting around?
>
> A Yes, but my doctor would never prescribe me a walker or anything. I'd tell her I fell numerous times . . . .
>
> Q Okay.
>
> A She didn't seem to give a crap.

(Doc. 10, p. 59)

The following testimony was adduced upon questioning by the ALJ concerning Dr. Laya's notation in the record that he had a new girlfriend:

> Q Okay. In September you told Dr. Laya . . . that you had a new girlfriend. Do you have a new girlfriend?
>
> A No, ma'am. I don't know where she got that from. I have a best friend that's a girl.

> Q   Do you see her? Spend time with her?
>
> A   Sometimes.
>
> Q   And what types of things to you do when you get to see her?
>
> A   We just sit around and watch movies and – because I'm not able, you know, to do much of anything.

(Doc. 10, pp. 51-52)

The following testimony was adduced upon questioning by counsel regarding entries in the record that plaintiff was obtaining pain medication from multiple sources:

> Q   Okay. There was a record that talked about you getting pain medications from several doctors. What was going on there?
>
> A   Well, I changed to Dr. Laya and she just prescribed me Xanax. And the other doctor was prescribing me Xanax. And I told her, you know, I had another doctor, but she did it anyway.
>
> Q   What was the Xanax for?
>
> A   My panic attacks.
>
> Q   What about pain medications? Were you getting pain medications from different doctors?
>
> A   I don't believe so.

(Doc. 10, p. 56)

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine

7

whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The SSA's burden at step five may be met by relying on the *Medical-Vocational Guidelines*, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R. §§ 404.1523, 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725-26 (6th Cir. 2014).

### III. ANALYSIS

#### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion.

8

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry*, 741 F.3d at 722. The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

**B. Claims of Error**

**1. Whether the ALJ Erred in Failing to Consider All of Plaintiff's Impairments and for Failing to Provide Sufficient Reasons for Not Finding These Impairments to Be Severe (Doc. 12-1, pp. 5-6)**

Plaintiff asserts that he has been diagnosed with chronic pain syndrome and hypertension. (Doc. 12-1, p. 5) He argues that the ALJ erred in "not find[ing] these impairments to be severe and . . . by failing to sufficiently state why she did not find them to be severe." (Doc. 12-1, p. 5) This claim of error pertains to the ALJ's decision at step 2, an inference supported by plaintiff's statement: "The Sixth Circuit, from time immemorial, has held that 'the step two severity regulation . . . [is] construed as a de minimis hurdle . . . .'" (Doc. 12-1, p. 5)

The ALJ determined at step 2 that plaintiff had the following severe impairments: "carpal tunnel syndrome, human immunodeficiency virus (HIV), depressive disorder, N.O.S. and generalized anxiety disorder." (Doc. 10, p. 11)(bold omitted) Chronic pain syndrome and hypertension obviously are not among the severe impairments listed. However, the ALJ's failure to include these conditions as severe impairments constitutes harmless error because, as noted above, the ALJ determined that plaintiff had other severe impairments that permitted plaintiff to clear step 2. *See Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)(failure to find that an impairment was severe at step

9

2 was harmless error where other impairments were deemed severe). This part of plaintiff's argument is without merit. Because the ALJ's failure to include these limitations as severe impairments amounts to harmless error, the ALJ's alleged parallel failure to explain her decision was harmless as well. Plaintiff's second argument is without merit.

### 2. Whether the ALJ Considered and Weighed Dr. Laya's Opinion Properly
### (Doc. 12-1, pp. 7-9)

The crux of this claim of error is that the ALJ erred in her treatment of the letters written by Dr. Laya to Judge Glenn. The record shows that Dr. Laya is a treating physician.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d 365, 376 (6th Cir. 2013)(quoting 20 C.F.R. § 404.1527(c)(2)). The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

Plaintiff argues first that the ALJ did not give good reason for rejecting Dr. Laya's opinion expressed in the letters, and that the ALJ erred in discounting the letters at issue because they were not in the form of a functional assessment. Where a treating source "makes broad 'conclusory formulations, regarding the ultimate issue which must be decided by the Secretary, [those findings] are not determinative of the question of whether or not an individual is under a disability.'" *Anthony*,

266 Fed.Appx. at 459 (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)(finding valid the ALJ's decision not to accept the opinion of a treating physician because the opinion was not supported by detailed clinical or diagnostic evidence)). A plain reading of the letters at issue shows that they are "cursory," devoid of any clinical and/or diagnostic evidence, and do not provide a "functional assessment of [plaintiff's] ability to work . . . ." These are the reasons the ALJ gave in the decision for according Dr. Laya's opinions "little weight," reasons fully supported by the record. (Doc. 10, p. 19) Plaintiff's first argument is without merit.

Plaintiff argues next that the ALJ erred in not contacting Dr. Laya "for clarification prior to reaching a decision." Plaintiff was represented by counsel in the proceedings below. The ALJ does not have a duty to develop the record where the claimant is represented by counsel. *See Bass v. McMahon*, 499 F.3d 506, 514 (6th Cir. 2007); *see also Culp v. Comm'r of Soc. Sec.*, 529 Fed.Appx. 750, 751 (6th Cir. 2013)(citing *Duncan v. Sec'y of Health and Huyman Servs.*, 801 F.2d 847, 856 (6th Cir. 1986)). Plaintiff's second argument also is without merit.

### 3. Whether the ALJ Considered and Weighed Dr. Johnson's Opinion Properly
### (Doc. 12-1, pp. 9-11)

This claim of error focuses on the two reports written by Dr. Johnson. Plaintiff argues first that the ALJ erred in mistakenly attributing Dr. Johnson's opinions to Dr. Surber, the latter of whom was not a medical source in the proceedings below. Plaintiff concedes that, despite this obvious error in names, "it appears that the ALJ was weighing Dr. Johnson's opinions rather than Dr. Surber's opinions . . . ." (Doc. 12-1, p. 9) As shown below, plaintiff's conclusion on this latter point is supported by the record.

The ALJ noted the following in her detailed analysis of Dr. Johnson's reports: "For Unknown reasons, Dr. Johnson completed two assessments of the claimant's ability to work." (Doc. 10, p. 17)

The ALJ's analysis described plaintiff's ability to do sedentary work in the first report, and light work in the second report. The ALJ made the following subsequent reference to "Dr. Surber"in her summary of the opinion evidence: "Consultative examiner, Dr. Surber, provided two opinions of the claimant, finding him able to perform both sedentary and light work . . . . However, both of these opinions are far too restrictive, in light of the unimpressive medical treatment a[s] a whole. Consequently . . . [his] . . . opinions are given very little weight." (Doc. 10, p. 19) The ALJ did not refer to Dr. Surber again in the decision, nor did she refer again to Dr. Johnson by name. The record shows that only Dr. Johnson provided <u>two</u> assessments of plaintiff's ability to work.

The ALJ's reference to Dr. Surber is an obvious typographical/clerical error. Such mistakes do not constitute reversible error. *See Gribbins v. Comm's Soc. Sec. Admin.*, 37 Fed.Appx. 777, 779 (6th Cir. 2002)("the district court d[id] not err in finding a mere typographical error in the ALJ's second statement regarding residual functional capacity"); *see also, Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993)("th[e] court must examine the evidence in the record 'taken as a whole'")(citation omitted). Because the ALJ's mistaken reference to Dr. Surber constitutes harmless error, plaintiff's first argument is without merit.

Plaintiff argues next that the ALJ mischaracterized the two reports at issue. More particularly, plaintiff asserts that the first report limited him to less than sedentary work, not sedentary, and the second report reflected that he was capable of performing sedentary work, not light. (Doc. 12-1, p. 10) The Magistrate Judge assumes for the sake of this analysis that the two reports were characterized improperly as plaintiff argues.

As noted above, the ALJ gave Dr. Johnson's reports "very little weight" because "both of th[e] opinions [we]re far too restrictive . . . ." (Doc. 10, p. 19) Thus, the question becomes what difference would it have made on the ALJ's decision had the two reports been viewed as even more

restrictive? In other words, given that Dr. Johnson's opinions were given "very little weight" because they were "far too restrictive" in the first place, is it likely that the ALJ would have given Dr. Johnson's reports greater weight were those same reports even more restrictive? The obvious answer is: "No!" Nor has plaintiff offered any insight into how he thinks the results would have been different under these circumstances, *i.e.*, how he would have benefitted had the ALJ given the reports at issue an even more restrictive reading. Because any error on the ground alleged is harmless, plaintiff's second argument is without merit.

Finally, plaintiff argues that the ALJ's reasoning for rejecting Dr. Johnson's opinions "were not sufficient and did not provide concrete reasons to explain why the opinions were rejected." (Doc. 12-1, pp. 10-11) As previously established, the ALJ's explanation for rejecting Dr. Johnson's opinions was that "both of these opinions are far too restrictive, in light of the unimpressive medical treatment history as a whole." (Doc. 10, p. 19)

An ALJ is "procedurally required to 'give good reasons . . . for the weight [she gives a] treating source's opinion.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)(citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). However, "this requirement only applies to treating sources." *See Ealy*, 594 F.3d at 514-15 (citing *Smith*, 482 F.3d at 877). Indeed, the ALJ is not required to explain his reasons for the weight he gives to the opinion of nontreating, examining sources. *See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6th Cir. 2012)("[A]n ALJ need only explain [her] reasons for rejecting a treating source statement because such an opinion carries 'controlling weight.'")(citing *Smith*, 482 F.3d at 876 ("[T]he SSA requires ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)). Because the ALJ was not required to explain the weight she gave to Dr. Johnson's report, even though she did, plaintiff's third argument is without merit.

### 4. Whether the ALJ Erred in Giving Great Weight to the
### Opinions of Non-examining Consultants
### Drs. Fletcher and Parrish
### (Doc. 12-1, pp. 11-12)

Plaintiff argues that the ALJ erred because she did not explain why she gave "great weight" to the opinions of Drs. Fletcher and Parrish, both of whom were nontreating nonexamining sources, or why she gave their opinions greater weight than she gave Dr. Johnson's, a nontreating examining source. (Doc. 12-1, pp. 11-12) As explained above, the ALJ was not required to explain the weight she gave to the reports of Drs. Fletcher and Parrish. This argument is without merit for reasons already explained.

### 5. Whether the ALJ Erred by Relying
### on GAF Scores
### (Doc. 12-1, p. 12)

Plaintiff asserts that the ALJ erred by relying on his GAF score to decrease the severity of his mental impairments and limitations. Plaintiff makes the following arguments citing *Kennedy v. Astrue*, 247 Fed.Appx. 761 (6th Cir. 2007): 1) the Commissioner has declined to endorse GAF scores; 2) GAF scores have no direct correlation to the severity requirements of the mental disorders listings. (Doc. 12-1, p. 12)

The ALJ wrote the following in her decision pertaining to plaintiff's GAF score: "His Global Assessment of Functioning (GAF) Score was 60-65, indicating only mild symptoms of mental impairment, per the DSM-IV." (Doc. 10, p. 18) Apart from this single reference in the RFC analysis, the ALJ did not mention plaintiff's GAF score again.

*Kennedy* supports plaintiff's arguments insofar as those arguments go. However, plaintiff neglects to mention that *Kennedy* also states "[a] GAF score may help an ALJ assess mental RFC." *Kennedy*, 247 Fed.Appx. at 766. Indeed, *Howard v. Commissioner of Social Sec.* 276 F.3d 235 (6th

Cir. 2002) provides binding authority to that end. *Howard*, 276 F.3d at 241 ( a GAF score "may be of considerable help to the ALJ in formulating the RFC"). In short, *Howard* and *Kennedy* both stand for the proposition that, while a GAF score is not dispositive on the issue of mental impairments, the ALJ may consider GAF scores in her RFC assessment. This argument is without merit.

### 6. Whether the ALJ Properly Evaluated and Assessed Plaintiff's Statements Under SSR 96-7P (Doc. 12-1, pp. 13-15)

Plaintiff makes the following arguments in the context of this claim of error: 1) the ALJ "merely stated that she used the criteria outlined in SSR 96-7P . . . rather than specifically stating the weight she gave to the claimant's statements and the reasons for that weight"; 2) the ALJ made only a conclusory statement in support of her credibility determination; 3) the ALJ improperly discounted plaintiff's credibility because he appeared at the hearing with a walker, denied he had a new girl friend, and because two physicians declined to treat him further after he obtained pain medication from multiple physicians. (Doc. 12-1, pp. 13-14)

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)(quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)). Notwithstanding the foregoing, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm's of Soc. Sec.*, 437 Fed.Appx. 370, 371 (6th Cir. 2011)(quoting *Walters*,

127 F.3d at 531).

As to plaintiff's first argument, SSR 96-7P does not require the "adjudicator" to use the word "weight," much less that the "adjudicator" attach an adjective to the word "weight," *e.g.*, none, very little, little, some, great, etc., to satisfy the provisions of SSR 96-7P. SSR 96-7P requires only that the credibility finding make it "clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements for that weight." SSR 96-79, 1996 WL 374186 at * 2 (S.S.A.). As discussed in detail below, the decision is abundantly clear as to why plaintiff's credibility was wanting in the ALJ's eyes. Plaintiff's first argument is without merit.

Plaintiff asserts in his second argument that the ALJ made a single conclusory statement regarding plaintiff's credibility. Although it is unclear from the pleadings what single conclusory statement the ALJ is supposed to have made, as shown in the excerpts below, the ALJ's provided substantially more reasoning as to plaintiff's credibility than plaintiff claims:

> . . . . In September 2009, he presented to treating physician, Robert Gaston . . . reporting that his medications were locked in the glove compartment of his truck and someone had stolen them. He said that he had previously gone to his pain clinic; however, 'they' would not refill his medications. Dr. Gaston also refused to refill his pain medications . . . .
>
> In February 2010, pain management notes . . . indicated that the claimant was "already getting Percocet from another physician and going to different pharmacies" . . . Consequently, the claimant was told he would no longer be treated with any controlled substances. Regardless, the claimant, subsequently, reported to Dr. Gaston that he had lost his insurance and was not able to continue to go to the pain clinic. Consequently, the claimant was prescribed additional pain medications. . . . May 2010 notes indicated that Dr. Gaston had found out that the claimant was dismissed from the pain clinic because he was getting pain medications from other physicians. Therefore, Dr.

> Gaston also released the claimant from care. . . .[3]

(Doc. 10, pp. 15-16)

> . . . . There is simply no way the claimant can be found credible. The claimant presented with a walker to the hearing, admitting that it was not prescribed. In fact, the claimant actually testified that his physician would not prescribe a walker. . . . [W]hen asked if he thought HIV affected his ability to work, he first testified that "it might," then after a long pause to think, said "yes," and went on the testify about how his counts were lower when he was working because he was stressed. . . . The claimant testified that he could sit for one hour maximum and that would be with a lot of alternating. Yet, he sat for one hour during the hearing without any observed pain behaviors. . . . When specifically questioned on a reference of a "new girlfriend" in the records, the claimant denied having a girlfriend, stating he had a best friend that was a girl and later admitted he did things with his friend, such as watching movies together. . . . Reducing the claimant's credibility further was that fact that he was released from the care of two different physicians because of obtaining pain medication from several different physicians; while denying this during the hearing and testifying that he had actually informed . . . doctor [Laya] of this. This testimony is in direct conflict with actual treatment notes. . . .

(Doc. 10, pp. 19-20) Plaintiff's second argument lacks an arguable basis in law or fact. Therefore, it is frivolous.

Finally, plaintiff argues that the ALJ erred in construing the following against his credibility: 1) his use of a walker at the hearing; 2) the discontinuity between his statement to Dr. Laya that he had a new girlfriend and his testimony at the hearing; 3) the fact that he was released by two physicians because he was obtaining pain medication from multiple physicians. (Doc. 12-1, p. 14)

Taking the elements in the paragraph above in reverse order, plaintiff argues that the ALJ erred in considering the record of his obtaining pain medication from more than one source because

---

[3] The Magistrate Judge notes solely as a matter of interest that the death certificate attached to the second motion to substitute shows plaintiff died from cardiac arrest due to an accidental drug overdose. (Doc. 15, Attach. 1)

17

those events preceded the amended onset date. SSR 96-7P provides that the ALJ must consider the record as a whole when making credibility determinations. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411, 417 (6th Cir. 2011). Because the evidence of plaintiff's deceitfulness in obtaining multiple prescriptions for pain medication was in the record, the ALJ was required to consider it. Moreover, the ALJ was justified in concluding that plaintiff lied under oath when she asked plaintiff the question, "Were you getting pain medications from different doctors," and plaintiff responded, "I don't believe so" – his denial coming just two questions after he tried to put the blame for the duplicate prescriptions on Dr. Laya.

As for the "new girlfriend" reported by Dr. Laya, given plaintiff's initial denial that he had one, his subsequent evasiveness on the subject, and history of deceit perpetrated upon his doctors, the ALJ was justified in viewing plaintiff's testimony as a effort to draw the ALJ's attention away from Dr. Laya's report that his "best friend that's a girl" also went to a pain clinic. Although plaintiff maintains that he "was honest about this and clarified the issue at the hearing," the ALJ was justified in viewing plaintiff's testimony on the subject as yet another attempt at deceit.

Lastly, plaintiff argues that "[h]e cannot be faulted for obtaining a walker on his own if it allows him to ambulate better or feel more stable." (Doc. 12-1, p. 14) Neither can the ALJ be faulted for viewing plaintiff's use of a walker at the hearing as an attempt to deceive her given the pattern of deceit described above, and the near-total absence of any correlation between plaintiff's subjective complaints and objective evidence described in great detail in the decision. Plaintiff's final argument is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 12) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 18th day of May, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge